<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action |
| | ) | No. 09-cr-00212 |
| vs. | ) | |
| | ) | |
| TIMOTHY SNARD | ) | |
| | ) | |
| Defendant | ) | |

\*     \*     \*

APPEARANCES:

      JOSEPH R. STAUFFER, ESQUIRE
      Special Assistant United States Attorney
         On behalf of the United States of America

      GREGORY L. NESTOR, ESQUIRE
         On behalf of Defendant

\*     \*     \*

<u>O P I N I O N</u>

JAMES KNOLL GARDNER,
United States District Judge

      This matter is before the court on Defendant's Motion to Suppress filed May 27, 2009.  The United States' Response in Opposition to Defendant's Pre-trial Motions[1] was filed on June 11, 2009.  On July 6, 2009, the Memorandum of Law in Support of Defendant's Motion to Suppress was filed.  On August 20, 2009 I conducted a hearing and closing arguments on Defendant's Motion to Suppress and took the matter under advisement.  For the reasons expressed below, I deny Defendant's Motion to Suppress.

---

    [1]    Defendant Timothy Snard filed a single motion to suppress and no other motions.  Thus, notwithstanding the title of the government's response, there is only one motion before the court.

PROCEDURAL HISTORY

On March 31, 2009 a federal grand jury returned a three-count Indictment charging defendant Timothy Snard with possession with intent to distribute crack cocaine[2], in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) (Count One); possession of a firearm[3] during and in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) (Count Two); and convicted felon in possession of a firearm or ammunition in violation of 18 U.S.C. § 922(g)(1) (Count Three).  These charges arise out of defendant's arrest on a New York State parole violation on September 12, 2008.

On April 28, 2009 defendant Timothy Snard made his initial appearance, was arraigned and pled not guilty to all charges, before United States Magistrate Judge Henry S. Perkin.

On May 27, 2009 defendant filed the within motion to suppress.  In his motion, defendant seeks to suppress "any and all items seized during the search of the hotel room in which defendant was arrested; or, in the alternative,...the gun found in or under the bed which was seized during the search of the

---

[2]     Count One of the Indictment specifically charges that "defendant TIMOTHY SNARD knowingly and intentionally possessed with intent to distribute five or more grams, that is, approximately 10.66 grams, of a mixture and substance containing a detectable amount of cocaine base ('crack'), a Schedule II controlled substance."

[3]     The firearm (and ammunition) which defendant is alleged to have possessed is described in Counts Two and Three of the Indictment as "a Taurus, model PT 145 Pro, .45 caliber semi-automatic pistol, serial number NAS23808, loaded with eight live rounds of ammunition".

hotel room in which the defendant was arrested."  The items seized included "a handgun with a loaded magazine and a bag containing 39 rocks of an off white substance consistent with crack cocaine, and a bag of green leafy vegetable matter consistent with marijuana....two digital scales, razor blade, box of clear plastic baggies..., and two cigars, and the room key...."[4]

On August 20, 2009 I conducted a hearing on defendant's motion.  Testimony was presented from one government witness.[5] The government introduced three exhibits into evidence at the hearing.  In addition, defendant introduced two exhibits into evidence at the hearing.

<u>FACTS</u>

Based upon the pleadings, the testimony of the witness, the exhibits presented at the hearing conducted August 20, 2009, and my credibility determinations, I find the following to be the pertinent facts.

At 5:10 p.m. on September 12, 2008, Allentown Police Officer John W. Brixius, III received a call in his patrol car from the Allentown Communications Center.  The call directed him to proceed to room 434 of the Hotel Traylor, located at

---

[4]     See Defense Exhibit 2: the Allentown Police Department report on a Lehigh County Arrest and Booking Data Sheet form dated September 13, 2008 for the September 12, 2008 occurrence and arrest.

[5]     The government presented the testimony of Officer John W. Brixius, III of the City of Allentown Police Department.

1444 Hamilton Street, Allentown, Lehigh County, Pennsylvania, to investigate a "wanted party".

Officer Brixius was informed that the directive was based on information received in a call to the Communications Center.  The call screen in Officer Brixius' police vehicle identified the caller as Sade Johnson.  The Communications Center advised Officer Brixious that Miss Johnson stated that there was a wanted party, a Victor Brewington or Timothy Snard, in room 434, and that there was a gun, and possibly drugs, in the room. The female caller also told the Communications Center that Timothy Snard's birth date was September 19, 1982, which the dispatcher passed on to Officer Brixius.

When Officer Brixius received that information, he tried to confirm the warrant by programming the information which he had received about Timothy Snard into the mobile version of the National Crime Information Center ("NCIC") which was in his police patrol car.

Officer Brixious checked to see if there was an entry. He received information back from NCIC on his vehicle screen that Timothy N. Snard was a black male, six feet, five inches tall, weighing 200 pounds, with brown hair and eyes, light skin, and a small tattoo on his left arm.  In addition, the NCIC report stated that he was born on September 19, 1981 (the same month and

day reported by Miss Johnson, but one year earlier than the year she provided).

Furthermore, the NCIC report indicated a number of aliases for Mr. Snard.  They included Nathaniel Brewington, Victor D. Brewington, Victor N. Brewington and Brown Oval.  The report stated that defendant was wanted for a parole violation by the State of New York.  It also indicated "full extradition unless otherwise noted".  However, there was nothing "otherwise noted" in the report.[6]

At 5:39 p.m. Officer Brixius was able to confirm that the New York State Parole Department in Albany was willing to extradite defendant Snard.  The parole department notified the Allentown Communications Center and then faxed the Communications Center a Hit Confirmation Response.  It confirmed that the Allentown Police should take defendant into custody and hold him for extradition to New York.[7]

Because a gun was mentioned by the caller, Sade Johnson, numerous Allentown Police officers were dispatched to

---

[6]     The foregoing information about Timothy Snard was received by Officer Brixius on the screen in his patrol car shortly after 5:10 p.m. in response to his NCIC inquiry.  He could not print out that information from the police car.  However, later that evening at 7:20 p.m., the Communications Center printed out the NCIC version which he had received earlier on his vehicle screen.  See Government Exhibit 1: the NCIC printout.

[7]     See Government Exhibit 2, Hit Confirmation Response faxed by the New York State Parole Department to the Allentown Police Communications Center at 5:39 p.m. on September 12, 2008.  The fax transmission read, "Above subject ['wanted person' Timothy Snard] is wanted by the NYS Division of Parole for parole violation - Warrant is active - Please hold subject on the basis of our want - Parole will extradite and contact your agency by phone after 8-30 a.m. on the next business day...."

-5-

the Hotel Traylor.  In addition to Officer Brixius, they included Officer Kyle Pammer and Officers Turoczi, DeWalt and Kocher.

When they arrived at the Hotel Traylor, the officers proceeded to the fourth floor to locate defendant.  Room 434 is at the end of a hallway with a four-foot section where the officers could be trapped.  As a result Officer Brixius determined that because Miss Johnson had mentioned a firearm, it was best for officer safety to attempt a ruse to get defendant to open the door without the officers having to arm themselves and possibly being in a bad position to move.

Officer Brixius knocked on the door of room 434.  A person inside the room responded, "Who is it?"  Officer Brixius responded, "J".  The voice inside the room asked, "Who are you looking for?"  Officer Brixius responded, "T".  The voice answered, "You have the wrong room."

At this point Officer Brixius knocked at the door again and stated, "It's the Allentown Police" and commanded the occupant to open the door.  The voice inside the room asked, "Who are you looking for?"  Officer Brixius responded, "Timothy Snard."  The voice responded back, "Just a minute."  From this point, about a minute elapsed before defendant opened the door to

his hotel room.  Officer Brixius heard the speaker move away from the door when he said, "Just a minute."[8]

The door was opened by the occupant, defendant Timothy Snard.  Defendant was wearing a white tank top and grey thin boxer-type shorts. He had no shoes or socks on.

Officer Brixius observed a tattoo on defendant's left arm on his bicep that said "Vic" and concluded that "Vic" was consistent with the wanted person's alias: Victor Brewington. Officer Brixius also observed that the occupant was a black male who appeared to be about six feet, five inches tall, and to weigh about 200 pounds, which was consistent with the individual wanted for a parole violation in New York, as described in the NCIC report.  Based on his observations, Officer Brixius determined that the individual in the doorway was the person that the officers were looking for.

Officer Brixius asked defendant what his name was, and defendant identified himself as Victor Brennington.[9]  One of the officers asked defendant to turn around.  He did so, and one of the officers handcuffed him behind his back.

_____

[8]     Officer Brixius testified, "I could hear that he moved away from the door when he said, 'Just a minute,' he was a further distance after the initial time when I said that it was police."  Notes of Testimony of the August 20, 2009 pre-trial motion hearing ("N.T.") at page 52, lines 15-17.

[9]     Although one of defendant's aliases was Victor Brewington, the hearing transcript and audiotape each indicate that both the government witness, Officer Brixius (N.T. page 29, line 13), and government counsel, Special Assistant United States Attorney Joseph R. Stauffer (N.T. page 57, line 6), stated that the name which defendant gave Officer Brixius was "Victor Brennington".

-7-

Defendant asked why he was being arrested, and one of the officers responded that it was for a parole warrant.

Defendant then asked, "Can I get my clothes?", and walked hurriedly back into the room and sat on a bed.  All of the officers walked in and trailed behind him to prevent him from going any further.  Officer Brixius requested defendant to stand up, and Officer Kocher directed defendant to stand with him back at the doorway.  Defendant walked back to the hall doorway where Officers Kocher, Pammer and DeWalt all stayed with him.

Officer Turoczi then re-entered the room, followed by Officer Brixius to check for other possible assailants for officer safety and to conduct a "span of control" search in the area where they were going to seat defendant to assist him in getting dressed.

As Officer Brixius walked back into the room he observed several items in plain view.  He saw "baggies" (small plastic bags typically used to package a sandwich, but which are frequently used to package cocaine).  The baggies were observed on a nightstand to the left of the bed.

As he approached the bed, Officer Brixius observed a digital scale[10] on a desk which was a few feet from the foot of the bed.  There was also a digital scale and a razor on a

---

[10]   Although in his testimony, Officer Brixius and government counsel referred to each scale as "a scale" or "a second scale" (N.T. page 17, line 24; page 18, lines 1 and 22; page 19, line 2), the police report (Defense Exhibit 2) describes them as "two digital scales".

-8-

nightstand to the right of the bed.  Officer Brixius also saw a
Hotel Traylor key for room 434 and two Dutch Masters cigars on
the bed.

Officer Brixius did not have to move any articles out
of the way, open any drawers, or go into any closets to see any
of those items.  Neither Officer Brixius nor Officer Turoczi did
that, nor did they look anywhere where a person could not be
concealed.  After the officers entered the hotel room, less than
a minute elapsed until they observed these items.

Based upon his experience as a police officer, Officer
Brixius believed that the baggies, scales and razor were all used
for measuring, cutting, weighing and packaging crack cocaine.

Officer Turoczi went to check the bathroom for
occupants.  After he did so and returned, Officer Brixius asked
Officer Turoczi to cover Officer Brixius as Officer Brixius
lifted the box spring and mattress to check under the bed.
"Cover" means that Officer Turoczi would be armed to protect
Officer Brixius if someone were under the bed.  As a result,
Officer Turoczi was a few feet away from Officer Brixius with his
gun drawn in a position to protect Officer Brixius as he lifted
the bedding.

Before he lifted the bedding, Officer Brixius looked at
the bed and saw no bulges or anything sticking out from it.  He

also walked over to the bed and patted on the surface but felt no weapons.

Officer Brixius then went to the foot of the bed to lift the mattress and box springs.  He did not want to crouch down and peer under the bed because it would put him in a poor position tactically if someone were under the bed.  In addition, Officer Brixius did not put his foot under the bed because he was concerned that if someone were under the bed, that person could shoot or stab his foot.

The bed was a platform-type bed which rested on top of four wooden slats in the form of a rectangle.  The bed was ten to twelve inches off the ground.  The mattress overlapped the box frame by eight to twelve inches, but Officer Brixius did not know how the bed frame was constructed until he lifted the mattress, and he believed that a person easily could have been hiding under it.

Officer Brixius lifted the mattress and box spring from the center of the foot area of the bed.  The bed as made and resting on the platform was approximately a foot off the ground. Officer Brixius lifted it on an angle one to two feet from the platform itself.  Officer Turoczi looked underneath the bed but did not observe anyone hiding there.

When Officer Brixius lifted the bed, a silver and black Taurus .45 caliber semiautomatic subcompact handgun fell from a

hole torn into a stapled piece of fabric across the bottom of the box spring.  The fabric was the type of fabric which is typically stapled to the bottom of a box spring.  The pistol was approximately seven to eight inches long, five inches tall, and an inch thick.  Also falling from the bottom of the box spring was a bag of thirty-six individually wrapped pieces of crack cocaine, plus three separate individually wrapped additional pieces of crack cocaine, and a bag of marijuana.

Officer Turoczi picked up the firearm to check and unload it safely.  He removed the magazine from the handle of the pistol.  The magazine was loaded with eight rounds of .45 caliber ammunition.  There was no round in the chamber.

Between thirty and forty seconds elapsed from the time defendant was moved back to the doorway and the revolver and drugs were found under the mattress.  Once the drugs and gun were found, no additional search of the room was made.

After the gun and drugs were located, the officers sat Mr. Snard on the bed to assist him in getting dressed.  When defendant saw the items laying on the floor, defendant said, "She set me up.  I can't believe she set me up.  This bitch set me up."

Because defendant was handcuffed, some of the officers assisted him in getting dressed in clothing appropriate for transporting him to the police station.  Initially Officer

Brixius contemplated allowing defendant to get dressed on his own.  After the firearm was found, Officer Brixius concluded that it would not be a good idea to do so.

Defendant was dressed in a pair of jeans that were laid across a chair to the desk where one of the scales was found.  He put on a pair of socks that were on a nightstand, a pair of boots and a T-shirt.  The officers gave him either a jacket or a hooded-typed of sweatshirt to wear.

Defendant was seated to put on his socks.  The officers had him stand in order to pull the pants up for him.  The officers placed the boots on him while he was standing up.

Later while waiting to be transported to police headquarters, defendant told Officer Brixius that he got into an argument with his girlfriend about defendant contacting his baby's mother, and that his girlfriend was upset with him.

While defendant and the officers were talking, Officer Brixius asked defendant how much back time he had on his parole warrant, and defendant said about six years.  They spoke about how much a room costs at the Hotel Traylor and where defendant was from originally.  (Defendant indicated that he was from East Orange, New Jersey.)

After defendant got dressed, Allentown Police Vice Officers Boyer and LeBron came to the hotel room and attempted to

talk with defendant.  During that time defendant smoked seven cigarettes.

At one point defendant requested to get his cash later. He pointed with his foot to a towel on the nightstand to the left of his bed.  Wrapped in the towel was $274.00 in United States currency.

As noted in the Procedural History section, above, the police seized the Taurus handgun, ammunition, crack cocaine, marijuana, two digital scales, razor blade, plastic baggies, and the hotel room key.  The record is silent on whether they also seized the $274.00 in United States currency.

After leaving the hotel room, Officer Brixius returned to police headquarters and made a diagram of defendant's hotel room.  He marked on the diagram where the items in the room were located when they were observed by Officer Brixius.[11]

<u>CONTENTIONS</u>

<u>Defense Contentions</u>

Defendant contends that the search of his hotel room and bed was illegal because the search was

(1)  not incident to a lawful arrest;

(2)  made without probable cause to believe that weapons or other evidence were present;

(3)  illegally broad in scope;

---

[11]     The diagram was marked and received into evidence at the within pre-trial hearing as both Government Exhibit 3 and Defense Exhibit 1.

    (4)   made without a search warrant or pursuant to an illegally issued search warrant;

    (5)   the result of prior illegal police activity and, therefore, tainted by that illegality.

Defendant also contends that

    (6)   no exigent circumstances justified the failure to obtain a search warrant; and

    (7)   defendant did not consent to the search, nor did anyone else who might validly consent.

Defendant argues that warrantless searches are presumed unreasonable.  Specifically, defendant asserts that absent a recognized exception to the warrant requirement, evidence obtained pursuant to a warrantless search must be suppressed as "fruit of the poisonous tree."  Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Defendant relies on the recent decision of the United States Supreme Court in Arizona v. Gant, ___ U.S. ___, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) for the proposition that the scope of a search incident to arrest is not unlimited.  The search incident to arrest may include only the area within the arrestee's immediate control.  Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Defendant contends that the term "immediate control" has been construed to mean the area from within which an arrestee might gain possession of a weapon or destructible evidence.  Id. More specifically, relying on Gant, defendant contends that there

-14-

is no justification for the search-incident-to-arrest exception if there is no possibility that an arrestee could reach into the area where law enforcement officers seek to search.

Defendant avers that even though <u>Gant</u> involved a car stop in which a defendant was placed in handcuffs in the back of a patrol car prior to the search of his vehicle, the same legal argument applies here because defendant was handcuffed and secured by a number of police officers.  Defendant contends that he could not have reached under the bed into the box spring where the police found the gun and drugs.  Thus, the evidence should be suppressed.

<u>Government Contentions</u>

The government contends that at the time of defendant's arrest on a valid warrant at the doorway of his hotel room, he asked to get his clothing, and then walked hurriedly back into his room and sat on a bed.  Because the police were responding to a report of a gun in the room, and attempting to serve an arrest warrant, and because after the police knocked on defendant's door and, after a brief ruse, identified themselves as the Allentown Police and told him they were looking for him, and commanded him to open the door, defendant retreated further into his room before answering the door, the police were justified in following defendant into his room, directing him to return to the doorway, and searching the area around the bed for officer safety.

-15-

Because in the course of their lawful entry into defendant's room to regain control over defendant, they saw indicia of possible drug use or sale (the baggies, razor and digital scales) in plain view, and as incident to a lawful arrest, the police were permitted to search the area immediately adjoining the place of arrest from which an attack could be immediately launched.  Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

Moreover, the government avers that the area which can be searched as a precautionary matter and without probable cause or reasonable suspicion includes looking into closets and other spaces immediately adjoining the place of arrest.  Id.

In addition, the government contends that it was the responsibility of the police to find clothing for defendant or to permit him to do so.  See United States v. DiStefano, 555 F.2d 1094, 1101 (2d Cir. 1977).  Because defendant was already in handcuffs, this obligation required and authorized the officers to enter the hotel room for the purpose of obtaining his clothing and assisting him in dressing.

The government further contends that because the police had a valid warrant for defendant's arrest from the State of New York for a parole violation, the officers properly searched the area around where defendant was seated, together with areas where someone could hide.  The search was limited to areas where

someone could hide and did not include a search of any drawers or cabinets in the room.  The area under the bed was a place where someone might hide.  Therefore the government asserts that lifting the bedding was reasonable for officer safety.

Hence, the government argues that based upon the facts of this search, defendant's motion to suppress should be denied. For the following reasons, I agree with the government.

<u>DISCUSSION</u>

Rule 41(h) of the Federal Rules of Criminal Procedure provides: "A defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides."  Fed.R.Crim.P. 41(h)  Rule 12 provides that suppression motions must be made before trial.  Fed.R.Crim.P. 12(b)(3)(C).

Normally, a defendant who files a motion to suppress carries the burden of proof.  <u>United States v. Chambers</u>, 228 F.Supp.2d 474, 476 (D.N.J. 2002)(Farnan, J.).  However, where a search is conducted without a warrant, the burden shifts to the government to demonstrate by a preponderance of the evidence that the warrantless search was conducted pursuant to an exception to the warrant requirement.  <u>See</u> <u>United States v. Herrold</u>, 962 F.2d 1131, 1137 (3d Cir. 1992).

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable

searches and seizures, shall not be violated...."  U.S. Const. Amend. IV.  Among the places which can be searched by the police, the home is the most sacrosanct, and receives the greatest Fourth Amendment protection.  See Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

The same protection against unreasonable searches and seizures extends to a person's privacy in temporary dwelling places such as hotel or motel rooms.  Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997). However, by its terms, the Fourth Amendment's protection against warrantless searches and seizures is not absolute. United States v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).

There are situations in which the public interest requires courts to show some flexibility in the application of the general rule that a warrant is a prerequisite for a search. However, those exceptions are limited.  For example, police may depart from the warrant requirement to enter a dwelling in a dangerous or emergency situation.  Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).  If the police see contraband in plain view while inside a home executing an arrest warrant or responding to a legitimate emergency, they

may seize it.  United States v. Menon, 24 F.3d 550, 559 (3d Cir. 1994).

In addition, when executing an arrest warrant in a person's home, the police may, in certain circumstances, conduct a limited protective search or sweep of the premises. Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).  It is a protective search or sweep that is at issue in this case.

In Maryland v. Buie, the Supreme Court held that incident to an arrest officers may conduct a "protective sweep".

> A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding.

494 U.S. at 327, 110 S.Ct. at 1094, 108 L.Ed.2d at 281.  A protective sweep is not a full search of the premises.  It may only extend to those places where someone might be hiding. Furthermore, the sweep should not last any longer than is necessary to dispel the reasonable suspicion of danger.  494 U.S. at 335, 110 S.Ct. at 1099, 108 L.Ed.2d at 287.

In this case the police properly conducted a protective sweep of defendant's hotel room on several independent grounds. First, it was a search incident to a lawful arrest (based on a valid arrest warrant) of the area under defendant's immediate

control.  Immediately after his arrest at the front door of his hotel room, defendant walked hurriedly into his room and sat on his bed.  This justified the officers in conducting a warrantless search of the bed area, which they did within forty seconds of defendant's return to the front door.[12]

Second, when after his arrest and handcuffing at the front door of his hotel room, defendant without permission hurriedly re-entered his room and sat on his bed, the officers were justified in entering the room to regain control over defendant and his environs and to conduct a protective sweep for officer safety.

Third, the police received a report of a firearm in the hotel room.  After they announced that they were the police, were looking for him, and commanded him to open the door, defendant initially moved away from the door, rather than opening it. These facts, coupled with the fact that after his arrest he hurriedly went back into his bedroom and sat on his bed without permission, created an emergency which justified the officers in entering and conducting a protective sweep to insure that they or others would not be injured with the firearm by defendant or other individuals who might be in the hotel room.

---

[12]    Even if defendant were correct that this is not a proper search incident to a lawful arrest (because the defendant had already returned to the front door and his bedroom was no longer an area under his immediate control), the protective sweep was appropriate based upon the other grounds listed below.

Finally, immediately after defendant was arrested and handcuffed at his front door he requested the opportunity to get his clothing.  Under the circumstances, his request amounted to a consent for the police to enter his hotel room for that purpose. That request and consent, combined with the report of a firearm in the room, justified the entry into the room by the officers, their protective sweep, and the seizure of contraband and evidence in plain view.[13]

As noted in my factual findings, when defendant answered the door to his hotel room he was clothed in only a pair of boxer-type shorts and a tank-top type T-shirt.  He requested to get his clothing, presumably because he was only partially dressed.  Because his clothing was in his hotel room, he would have to enter his hotel room to get his clothing if the request were granted.  Therefore his request to get his clothing was, in effect, a request to re-enter his hotel room.

Because defendant was in custody, handcuffed, and in the presence of five officers at the time of his request, he was not likely to be permitted to go back into his room unaccompanied.  Accordingly, his request was also, in effect, an invitation for at least one of the officers to enter defendant's hotel room with him.

---

[13]    As discussed below, the issue of whether the police have a duty to provide clothing to a partially clothed defendant is one that has not been squarely addressed by the United States Court of Appeals for the Third Circuit.

The government relies on the cases of <u>United States v. DiStefano</u>, 555 F.2d 1094 (2d Cir. 1977); <u>United States v. Leftwich</u>, 461 F.2d 586 (3d Cir. 1972); and <u>United States v. Titus</u>, 445 F.2d 577 (2d Cir. 1971) for the proposition that the police were required to provide defendant with adequate clothing before transporting him to the police station.

The issue of whether the police have a duty to provide clothing to a partially clothed defendant is one that has not been directly addressed in this Circuit.  In other Circuits, there appears to be either a police duty to provide clothing (as in the Second Circuit[14]) or a specific "clothing exception" requiring them to do so, which has been authorized (as in the Fourth[15] and Fifth Circuits[16]).  However, at least two Circuits have rejected the underlying rationale for the clothing exception (the Sixth and Ninth Circuits[17]).

In <u>United States v. Leftwich</u>, 461 F.2d 586 (3d Cir. 1972) the United States Court of Appeals for the Third Circuit addressed the issue of whether the search of a house was reasonable.  In <u>Leftwich</u>, defendant Frederick Wright needed street clothes to accompany the FBI agents to the Newark office.

---

[14]     See <u>United States v. DiStefano</u>, <u>supra</u>; <u>United States v. Titus</u>, 445 F.2d 577 (2d Cir. 1971).

[15]     See <u>United States v. Gwinn</u>, 219 F.3d 326 (4th Cir. 2000).

[16]     See <u>United States v. Clay</u>, 408 F.3d 214 (5th Cir. 2005).

[17]     See <u>United States v. Whitten</u>, 706 F.2d 1000 (9th Cir. 1983); <u>United States v. Kinney</u>, 638 F.2d 941 (6th Cir. 1981).

In that regard, prior to giving defendant his jacket, the FBI agent searched it and found a New Jersey motor vehicle registration which had potential evidentiary value in the case. The Third Circuit stated in its Opinion:

> It is undisputed that Wright required street clothes in order to accompany the FBI Agents to the Newark office and that, in his presence but prior to handing it to him, the agent searched the jacket in which the New Jersey motor vehicle registration was found.  The defendant Wright does not here contend that this search was unreasonable and we are clear that it was entirely reasonable. His claim is that the search of his entire house was unreasonable.  However, the only evidence which was admitted against Wright was the motor vehicle registration and the search for a seizure of that is, as we have said, not claimed to be violative of his constitutional rights.  All the other items seized by the agents were returned to the defendant and whether they were or were not lawfully seized was not before the district court nor is that question before this court on this appeal.  We conclude that the district court did not err in holding that the search for and seizure of the registration was valid.  The motion to suppress that evidence was properly denied.

461 F.2d at 592.

In United States v. Jones, 2000 U.S. Dist. LEXIS 17921 (E.D.Pa. Dec. 14, 2000) my colleague United States District Judge John R. Padova (now Senior Judge Padova) relied on the Third Circuit's decision in Leftwich in holding that because the officers in Jones had probable cause to arrest and detain defendant, their subsequent collection of clothing for defendant was proper and that it was also proper to search the clothing for weapons prior to giving it to defendant.

In the Snard case, I do not have the situation where the police searched the clothing to be given to defendant prior to actually giving it to him.  Rather, it is a protective search of the room where the clothing was located prior to actually obtaining the clothing for defendant.  As such, I conclude that Judge Padova's decision in Jones is not directly applicable to this case.

Moreover, I conclude that the Third Circuit's discussion of the search being proper in Leftwich is dicta because that issue was not actually preserved for review. Accordingly, I conclude that the Third Circuit has not squarely ruled whether there is a clothing exception in this Circuit. However, if I am incorrect about that, and the Third Circuit's discussion constitutes a holding, then there would be a clothing exception in this Circuit.  Nevertheless, for the following reasons, I conclude that whether or not a clothing exception exists has no bearing on this case.

Initially, as noted above, defendant asked the police to permit him to retrieve clothing from his hotel room.  For the reasons stated above, because defendant was already in custody and handcuffed, his request is equivalent to a consent for an officer to come into his room for the limited purpose of obtaining clothing.  Under these circumstances, the police are

clearly permitted under the Supreme Court's decision in <u>Buie</u> to do a limited protective sweep to ensure their safety.

Here, the police were in possession of information that this defendant may have a weapon.  Moreover, there was information regarding possible illegal drugs in defendant's hotel room.  It was perfectly reasonable and permissible for the police to do a limited protective sweep to check for other persons in the room.  The police did a very limited and brief sweep to check the closet, the bathroom and under the bed to see if were any other persons hiding in the room.

In hindsight, it appears that it was unlikely that someone was under the bed because of the type of platform frame under the bed.  However, this fact was not known to Officer Brixius until he actually lifted the mattress and box spring and observed the construction of the frame upon which the bed rested. It was equally reasonable for Officer Brixius not to either crouch down and look under the bed (putting himself in jeopardy of being shot or stabbed by someone under the bed) or feel around with his foot under the bed to determine if anyone were there (risking his foot being shot, stabbed, or otherwise injured).

The United States Supreme Court has repeatedly cautioned that when evaluating police conduct in the context of Fourth Amendment cases "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivation." Graham v. O'Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443, 456 (1989).  In this case, I find that the conduct of Officer Brixius and his colleagues was objectively reasonable.

In addition, I conclude that it was reasonable to grant defendant's request to obtain proper clothing before being taken to jail.  It was equally reasonable for the police to do a very quick and limited protective search to ensure their safety while in defendant's hotel room.  Accordingly, the discovery and seizure of the firearm and drugs which fell out of the box spring when lifted to search for someone hiding under the bed was justified under the Fourth Amendment.

Finally, I disagree with defendant's contention that the recent decision of the United States Supreme Court in Arizona v. Gant, ___ U.S. ___, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009) is controlling.  The facts of this case are clearly distinguishable from those in Gant.  Specifically, Gant involved a motor vehicle stop where defendant was placed in the back of a police car after which his vehicle was searched.  That factual circumstance is not applicable to this case where the police did a protective search of defendant's hotel room with defendant in close proximity.

CONCLUSION

After arresting and handcuffing defendant on a valid arrest warrant at the door of his hotel room, the police did not violate his Fourth Amendment rights by conducting a protective sweep of defendant's hotel room and bedding because defendant asked to obtain appropriate clothing before being transported to the police station, and then walked hurriedly into his room and sat on his bed before the officers responded.  Under the circumstances, defendant's request for clothing constituted both a request that the officers enter his room and his consent to them doing so.

The police had received a report that there was a gun, and possibly drugs, in the room.  Accordingly, their protective sweep was justified by articulable facts that the arrest scene posed a possible security and safety risk.

Therefore, the warrantless protective sweep of defendant's hotel room was justified on the following grounds: (1) a search incident to a lawful arrest; (2) an emergency exception to the warrant requirement; (3) regaining control over their prisoner and his environs; (4) ensuring officer safety; (5) defendant's request that they enter his room to obtain his clothing; and (6) defendant's consent to their entry.

Once legitimately inside defendant's room for any one of those purposes, the police were entitled to seize the evidence

of criminal activity which they observed in plain view (plastic baggies, a razor and two digital scales) and to seize the contraband and evidence which they encountered while performing a legitimate protective sweep (handgun, ammunition, crack cocaine and marijuana).

　　　　　For those reasons, I deny Defendant's Motion to Suppress the evidence acquired, and observations made, by the police in defendant's hotel room at the time of his arrest.